UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
3:23-cv-000199-RJC-DCK

| GXO LOGISTICS, INC., | ) | |
|---|---|---|
| Plaintiff, | ) | |
| v. | ) | |
| MARVIN W. CUNNINGHAM. | ) | **ORDER** |
| Defendant. | ) | |

**THIS MATTER** is before the Court on Plaintiff GXO Logistics, Inc.'s Motion for a Temporary Restraining Order and Preliminary Injunction (the "Motion"). (Doc. No. 18). For the reasons stated herein, the Motion is **DENIED**.

I.   **OVERVIEW**

GXO Logistics, Inc. ("GXO") filed this breach of contract action seeking to enforce a non-compete provision with a former c-suite executive, Marvin Cunningham ("Cunningham"). In doing so, GXO seeks to prevent Cunningham from working for his new employer, Prologis, Inc. ("Prologis"), until the non-compete provision expires. GXO argues that Prologis' recent expansion into "Workforce Solutions" positions Prologis as a competitor for whom Cunningham is forbidden to work and that Cunningham breached his non-compete agreement by accepting a position at Prologis as the head of its Workforce Solutions program. While GXO correctly notes that Prologis is a competitor, and while Cunningham's breach of his employment agreement seems imminent, GXO's own evidence shows that Cunningham has yet to breach that agreement. Thus, GXO fails to demonstrate a likelihood of success on the merits of its claim, and the Court cannot grant the extraordinary relief that GXO requests.

1

## II. BACKGROUND

GXO is a global "leader in supply chain solutions, including the design, management, and optimization of warehouse logistics operations." (Doc. No. 19, at 3). GXO describes its business as "third-party supply chain logistics," meaning GXO adds value by configuring and optimizing its customers' warehouses for maximum efficiency. (*Id.* at 10). To achieve that efficiency, GXO offers a range of technology and automation tools – most importantly (to GXO and to this action), GXO provides labor management optimization. (*Id*. at 4).

One labor management optimization tool GXO is offers is Smart, a "proprietary software program that incorporates data from GXO's human resource database, timekeeping software, and warehouse management system to project shipment volumes and labor needs at each of GXO's warehouses." (*Id.* at 7). As one of the four highest-ranking employees in the GXO AMAPAC (Americas and Asia Pacific) region, Cunningham helped develop and refine Smart and led "GXO's labor management optimization initiatives, operations and automation and technology tools in the AMAPAC region," gaining knowledge of confidential information, analytics, tools, and initiatives that GXO used throughout its business in the process. (*Id.* at 7-9).

When he was promoted to Chief Operating Officer for AMAPAC, Cunningham entered into an employment agreement (the "Agreement"). (*Id.* at 9-10). That agreement included fairly standard non-compete, confidentiality, and nonsolicitation provisions, including instructions not to compete with GXO anywhere within the United States for 18 months after Cunningham's departure from GXO and a promise from Cunningham not to disclose or use any of GXO's confidential information. (Doc. No. 1-1, Agreement, at ¶¶ 1, 7) Within the non-compete provisions, GXO defined "Competing Business" to include "providers of contract logistics

2

services" and a business that "competes with the segment of [GXO's] business with which you were employed." (Doc. No. 1-1, Agreement, at ¶ 18).

This agreement gained significance when Cunningham resigned from GXO on March 14, 2023 and accepted a position at Prologis. (Doc. No. 19, at 10). Prologis describes itself as a warehouse owner first and foremost, noting it "acquires, develops, and maintains the largest collection of high-quality logistics real estate in the world." (Doc. No. 23, at 1). Thus, in some situations, GXO and Prologis might work together to serve the same client – one might use a Prologis warehouse for their business and employ GXO as a third-party logistics provider inside that warehouse.

Recently, however, Prologis has expanded beyond real estate. In its 2023 Annual Report, Prologis explained that "[t]he nature of the services we are providing to our customers is expanding" and that it now "provide[s] a platform of solutions to address challenges that companies face in global fulfillment today … focus[ing] on innovative ways to meet our customers' operations, energy and sustainability, mobility and workforce needs." Prologis, Inc., *Annual report pursuant to Section 13 and 15(d)* 4 (Feb. 14, 2023).[1]

---

[1] *See also Prologis*, LinkedIn, https://www.linkedin.com/company/prologis/ (last visited May 12, 2023) ("Beyond real estate, our Essentials platform optimizes the company's global asset portfolio to provide our customers solutions that address today's warehouse and shipping challenges."); *Workforce Essentials*, Prologis, https://www.prologis.com/what-we-do/prologis-essentials/workforce-essentials (last visited May 12, 2023) ("[W]e provide the latest technology solutions to increase the productivity and safety of your workers"); *Id.* ("[W]e offer the latest in adaptable, scalable robotics solutions to power your digital warehouse and increase the productivity of your workers"); *Id.* ("[Through Prologis] you can optimize the entire picking process in your logistics facility and use operational reporting and management tools for realtime workflow optimization for associates and robots"); *Id.* ("Through Prologis partner WorkStep, we can help you acquire and retain the best logistics talent for your hourly workforce needs. Once hired, we'll provide real-time feedback, insights, and suggested actions to keep your workers highly engaged and empower managers to take the right actions to improve frontline retention and drive organizational improvements at your facility.").

3

This expansion, GXO notes, coincides with Cunningham's move to Prologis. According to Prologis' description of Cunningham's position, the Global Head of Workforce Solutions will be "focused on building a workforce solutions business from the ground up by leveraging the scale and reach of the Prologis platform." (Doc. No. 1-1, Job Description). With these new offerings, GXO alleges, Prologis competes with GXO, and Cunningham is spearheading that effort in his new position at Prologis, in violation of his non-compete and confidentiality agreements.

Cunningham disputes that narrative. First, Cunningham claims that Prologis is "GXO's landlord, not its competitor." (Doc. No. 23, at 1). Cunningham also asserts that, in standard industry practice, Prologis and GXO do not offer the same services to the same customers. (*Id.* at 2). Companies make an initial decision to either outsource logistics to a third-party logistics provider like GXO or to handle logistics in-house. If the company chooses third-party logistics, then Prologis might sell certain equipment to GXO, who will in turn use that equipment in its own business. If the company chooses in-house logistics, then the company still could buy equipment from Prologis, but, according to Cunningham, GXO does not sell one-off equipment apart from its full logistics business. Thus, Cunningham claims, the companies never compete for the same business from the same customer. (*Id.*).

GXO disagrees with Cunningham's framing. According to GXO, while Prologis does not offer "full service logistics," Prologis does offer tools to optimize warehouse workforce management and operations. (Doc. No. 24, at 5). Thus, the customer who chose to handle logistics in-house and may have been interested in switching to GXO is now less likely to do so because Prologis offers some of the same services to that customer. In addition, as Prologis notes, Prologis might sell certain equipment to GXO, but Prologis also might sell that equipment to GXO's

4

competitors, giving those competitors an edge against GXO. (*Id.*). In both of these situations, GXO argues, Prologis competes with GXO.

Still, Cunningham argues that even if Prologis' new sector (the "Workforce Essentials" branch of the new "Workforce Solutions" program) would compete with GXO in the future, neither Prologis nor Cunningham are doing so currently. (Doc. No. 23, at 2). Thus, according to Cunningham, the complaint "at best alleges that Mr. Cunningham will be *preparing* to compete at some unspecified time in the future by developing vaguely defined services that GXO fears '*will be offered* not only to GXO's direct competitors' but somehow '*will also allow Prologis to compete* for GXO's customers and potential customers.'" (*Id.*). Without any current competition, Cunningham claims, GXO's motion fails.

## III. STANDARD OF REVIEW

Temporary restraining orders and preliminary injunctions are extraordinary remedies "that may only be awarded upon a clear showing that the plaintiff is entitled to such relief" and may never be awarded "as of right." *Winter v. Nat'l Res. Def. Council, Inc.*, 555 U.S. 7 (2008). The standard for granting either a TRO or a preliminary injunction is the same and is well established. *Id.* The party seeking the preliminary injunction must demonstrate all of the following: (1) it is likely to succeed on the merits, (2) it is likely to suffer irreparable harm in the absence of preliminary relief, (3) the balance of equities tips in its favor, and (4) an injunction is in the public interest. *Winter*, 555 U.S. at 20; *Mountain Valley Pipeline, LLC v. W. Pocahontas Properties Ltd. P'ship*, 918 F.3d 353, 366 (4th Cir. 2019). "An injunction is an exercise of a court's equitable authority, to be ordered only after taking into account all of the circumstances that bear on the need for prospective relief." *Salazar v. Buono*, 559 U.S. 700, 714 (2010).

5

## IV. DISCUSSION

GXO argues that Cunningham breached the non-compete clause in his employment agreement by accepting a position with Prologis as its Global Head of Workforce Solutions immediately after resigning from GXO. Cunningham argues, in response, that Prologis does not compete with GXO and, alternatively, that even if Prologis and GXO were competitors, Cunningham is only preparing to compete with GXO at this time. Cunningham also argues that the non-compete agreement is overbroad and unenforceable.

GXO prevails on several of its arguments: the agreement is enforceable and Prologis' emerging Workforce Solutions program – especially its Workforce Essentials platform – does compete with GXO's business. Ultimately, however, because GXO fails to clearly show that Cunningham breached his employment contract by performing competitive services at Prologis, GXO is unable to establish a likelihood of success on the merits and the Court cannot grant the relief it seeks.

### A. Choice of Law

"A federal court exercising diversity jurisdiction is obliged to apply the substantive law of the state in which it sits, including the state's choice-of-law rules." *Volvo Constr. Equip. N. Am., Inc. v. CLM Equip. Co.*, 386 F.3d 581, 599-600 (4th Cir. 2004). Here, the Court's jurisdiction is based on diversity of citizenship and the Court must apply North Carolina's choice of law rules. Under North Carolina law, the interpretation of a contract is governed by the law of the place where the contract was made, unless "parties to a contract have agreed that a given jurisdiction's substantive law shall govern" in which case such provision "will be given effect." *Bueltel v. Lumber Mut. Ins. Co.*, 518 S.E.2d 205, 209 (N.C. Ct. App. 1999). The parties agreed that the 2021

Employment Agreement is governed by North Carolina law, and neither party disputes that North Carolina law applies. Therefore, North Carolina law applies to GXO's breach of contract claim.

B. **Likelihood of Success on the Merits**

"[P]laintiffs seeking preliminary injunctions must demonstrate that they are likely to succeed on the merits." *Pashby v. Delia*, 709 F.3d 307, 321 (4th Cir. 2013) (citations omitted). Plaintiffs need not show a "certainty of success" but must make a "clear showing" that they are likely to succeed at trial. *Id.* Here, GXO's likelihood of success on the merits turns on two issues: whether the non-compete is enforceable and whether Cunningham breached it.

1. **Enforceability of the Non-Compete Provision**

Non-competes are disfavored under North Carolina law, *Howard v. Oakwood Homes Corp.*, 134 N.C. App. 116, 121–22, 516 S.E.2d 879, 883 (1999), and their reasonableness is a matter of law. *Shute v. Heath*, 131 N.C. 281, 282, 42 S.E. 704, 704 (1902). The party who seeks enforcement of the covenant has the burden of proving the reasonableness of the agreement. *Hartman v. Odell and Assoc., Inc.*, 117 N.C. App. 307, 311, 450 S.E.2d 912, 916 (1994).

"To be enforceable under North Carolina law, a non-competition agreement must be: (1) in writing; (2) part of an employment contract; (3) based on valuable consideration; (4) reasonable as to time and territory; and (5) designed to protect a legitimate business interest." *Med. Staffing Network, Inc. v. Ridgway*, 194 N.C. App. 649, 655, 670 S.E.2d 321, 327 (2009). The parties do not dispute that the agreement here was in writing, part of an employment contract, and based on valuable consideration (Cunningham's promotion). GXO and Cunningham do, however, dispute whether the agreement is reasonable as to time and territory and whether the agreement is designed to protect a legitimate business interest.

7

### i. Reasonable as to Time and Territory

The Agreement restricts Cunningham from "perform[ing] any competitive services … for a Competing Business" anywhere within the United States, Mexico, or Canada for a period of eighteen months after his termination date. (Doc. No. 1-1, Agreement, at ¶ 7). "In evaluating the reasonableness of time and territory restrictions, the two elements must be considered in tandem because the two requirements are not independent and unrelated." *Precision Walls, Inc. v. Servie*, 152 N.C. App. 630, 637, 568 S.E.2d 267, 272 (2002). "Although either the time or the territory restriction, standing alone, may be reasonable, the combined effect of the two may be unreasonable." *Id.* at 638, 568 S.E.2d at 272. "A longer period of time is acceptable where the geographic restriction is relatively small, and *vice versa*." *Id.*, 568 S.E.2d at 273.

Considering territorial restrictions specifically, North Carolina courts look to: (1) the area or scope of the restriction; (2) the area assigned to the employee; (3) the area in which the employee actually worked; (4) the area in which the employer operated; (5) the nature of the business involved; and (6) the nature of the employee's duty and knowledge of the employer's business operation." *Id.*, 568 S.E.2d at 273 (citing *Hartman*, 117 N.C. App. at 312, 450 S.E.2d at 917).

An eighteen-month nationwide restriction is not necessarily unreasonable if a business is active nationwide. *Harwell Enterprises, Inc. v. Heim*, 276 N.C. 475, 481, 173 S.E.2d 316, 320 (1970) (holding two-year nationwide restriction reasonable because "business activities throughout the United States support the reasonableness of the restriction imposed as to the territory covered."); *see also Okuma Am. Corp. v. Bowers*, 181 N.C. App. 85, 92, 638 S.E.2d 617, 622 (2007) (holding six-month restriction that "potentially extend[ed] throughout North and South America" reasonable).

8

Here, GXO demonstrates that it actually engages in nationwide business activity and that Cunningham held nationwide responsibilities as the AMAPAC region Chief Operating Officer. Thus, the Agreement is reasonable as to time and territory under North Carolina law and GXO demonstrates a likelihood of success on the merits on this point.

### ii. Designed to Protect a Legitimate Business Interest

GXO seeks to: (1) prevent Cunningham from performing "competitive services for a Competing Business … in an area, division, or segment of that business that competes with GXO," and (2) "ensur[e] that Cunningham does not use [] confidential information … in a manner that benefits a competitor to the detriment of GXO." Cunningham appears to agree that both of these interests are legitimate, but he denies using any confidential information in his new position and claims he will never do so, he denies that he is competing with GXO by working for Prologis, and in addition, he argues that the Agreement is overly broad because it seeks to prevent activity outside GXO's legitimate business interest.

#### a. Preventing Competition

Restricting an employee from working for a competitor in an identical or similar position is a legitimate business interest, but even if non-compete protects legitimate business interests, it cannot be overly broad. *See Okuma*, 181 N.C. App. at 90-92, 638 S.E.2d at 621; *Precision Walls*, 152 N.C. App. at 638–39, 568 S.E.2d at 273. A non-compete is overly broad if, "rather than attempting to prevent the former employee from competing for business, it requires the former employee to have no association whatsoever with any business that provides similar services. Such a covenant would appear to prevent the former employee from working as a custodian for any 'entity' which provides similar services." *Id.* at 91, 638 S.E.2d at 621.

9

Cunningham argues that the Agreement is overbroad for two reasons: first, because Cunningham is, at worst, *preparing* to compete with GXO, and GXO cannot prevent employees from preparing to compete, and second, because the agreement is overly inclusive in defining "Competing Business," and GXO cannot prevent employees from engaging in non-competitive action. In response, GXO argues that Cunningham is competing by simply accepting a role at Prologis similar to his former role at GXO because, according to GXO, labor management optimization systems, technology, and automation are an "emerging and important area of competition between the companies." (Doc. No. 19, at 21). "Prologis' own statements and SEC filings make clear that it is offering competitive services now," GXO claims. (Doc. No. 24, at 10).

North Carolina law is uninformative on the distinction between competing and preparing to compete, but the issue need not be resolved here: the Agreement allows Cunningham to prepare to compete but prohibits "performing any competitive services" for a Competing Business, "own[ing] any financial interest" in a Competing Business, and "performing any services" for GXO customers. (Doc. No. 1-1, Agreement, ¶ 7). Because preventing former employees from working for a competitor in a similar position is a legitimate business interest, GXO demonstrates a likelihood of success on the merits on this point.

Cunningham also argues that the Agreement is overbroad because GXO defines "Competing Business" as "any firm [or] business … [that] (i) engages in the Business; (ii) engages in mergers, acquisitions, consulting, advising, investment banking or research related to the Business … (iii) sponsors or controls a private equity fund … that invests in companies engaged in the Business; [or] (iv) competes with the segment of our business with which you were employed." (Doc. No. 1-1, Agreement, ¶ 18). The Agreement also prohibits Cunningham from "research activities related to the Business, [including] analyzing and evaluating companies for

10

investment," and prohibits him from working for a company or fund that "invests in companies engaged in the Business." (*Id.*).[2]

The Agreement is not overbroad. The Agreement does not, as Prologis argues, prohibit Cunningham from accepting any position with a competitor (though GXO's definition of Competing Business is indeed far-reaching), and the Agreement does not prohibit Cunningham from working for non-competitors. Instead, the Agreement prohibits Cunningham from performing competitive services for a Competing Business, in an area, division or segment off the Competing Business that competes with GXO. Accordingly, under the Agreement, Cunningham could work anywhere he chooses, provided he does not perform competitive services for or own a financial interest in a Competing Business.[3]

This type of restriction is proper under North Carolina law. *See Okuma*, 181 N.C. App. at 92, 638 S.E.2d at 622 (approving restriction from employment with competitor unless "in an area of the competitor's business which does not compete" with former employer); *XPO Logistics, Inc. v. Northrop*, No. 319CV00348FDWDSC, 2019 WL 3543877, at *6 (W.D.N.C. Aug. 2, 2019) (finding a likelihood of success on the merits and granting TRO where "the noncompete restriction is limited to [the employee] performing services for a Competing Business in an area, division or segment within the business that competes with [the plaintiff corporation]." Thus, GXO demonstrates a likelihood of success on the merits on this point.

---

[2] "Business" means "any providers of contract logistics services." (Doc. No. 1-1, Agreement, ¶ 18).

[3] The Agreement also prohibits Cunningham from performing any services for any customers with whom Cunningham had significant business contact or communication. (Doc. No. 1-1, Agreement, ¶ 7(b)(iii)). Cunningham does not specifically contest this provision.

b. <u>Preventing Misuse of Confidential Information</u>

Preventing the disclosure and misuse of confidential information is a legitimate business interest, as Cunningham agrees. (Doc. No. 23, at 16); *see also Northrop*, 2019 WL 3543877, at *6 (finding a "clear showing of likelihood of success in establishing that [plaintiff corporation] has a legitimate business interest in protecting its Confidential Information [where employee] … explicitly acknowledged that she would receive Confidential Information in the course of her employment … and that her noncompete obligation was necessary to protect [plaintiff corporation's] Confidential Information, business and goodwill.").

Therefore, because the Agreement is in writing, is part of an employment contract, is based on valuable consideration, is reasonable as to time and territory, and is designed to protect a legitimate business interest, the Agreement is enforceable under North Carolina law.

### 2. Cunningham's Breach of the Non-Compete

*i. Whether Cunningham has Performed Competitive Services*

The Agreement provides: "[Y]ou expressly agree that, during the Restricted Period, you will not, anywhere within the Restricted Territory: (i) **perform any competitive services** … **for a Competing Business** in an area, division[,] or segment of the Competing Business that competes in any way with … the Company's Business; … or (iii) **perform any services for any of our customers** with whom you had significant business contact or communications during the last two (2) years of your employment if those services (A) are similar to or reasonably related to the services you performed while employed by us the last two (2) years of your employment with us or (B) can be enhanced or facilitated by using any of our Confidential Information to which you had access during your employment." (Doc. No. 1-1, Agreement, ¶7(b)(i), (iii)) (emphasis added).

12

GXO demonstrates a likelihood of success on the merits in showing that Prologis is a Competing Business. Though GXO does not include Prologis in its wide-ranging list of direct competitors, (Doc. No. 1-1, Agreement, at 12), GXO does demonstrate that Prologis "engages in the Business" and "competes with the segment of our business with which [Cunningham was] employed." (Doc. No. 1-1, Agreement, ¶ 18); *see* Prologis, Inc., *Annual report pursuant to Section 13 and 15(d)* 4 (Feb. 14, 2023); *supra* footnote 1. Thus, Prologis falls within the Agreement's definition of a Competing Business.

Because Prologis is a Competing Business, Paragraph 7(b)(i) of the Agreement is doubly notable. GXO took apparent care to prohibit Cunningham from performing *any* services for a GXO customer while prohibiting him from performing only *competitive* services for a Competing Business. Moreover, this is no slipshod alteration – Paragraph 7(b)(i) is especially remarkable considering the differences between GXO's Agreement at issue here and that used by GXO's corporate predecessor, XPO Logistics, Inc. ("XPO"), in another case before this Court. In *XPO Logistics, Inc. v. Northrop*, this Court analyzed a non-compete agreement used by XPO in 2016. That contract, in contrast to the one at issue here, forbid the employee from "perform[ing] *any* services, whether as an employee, agent or independent contractor for a Competing Business." 2019 WL 3543877, at *2 (emphasis added). Thus, not only does GXO delineate between "services" and "competitive services" within the Agreement itself, but GXO also either changed its standard non-compete to include such language since 2016 or it particularized the language for Cunningham (or some group of comparable workers). No matter how GXO settled on the language, the distinction between a restriction on "any services" and "competitive services" is meaningful.

13

Thus, because Prologis competes with GXO,[4] Cunningham could violate his non-compete by performing a competitive service at Prologis. The following are some of Cunningham's expected responsibilities at Prologis as the Global Head of Workforce Solutions, as described in Prologis' job description: "Leading the development of a business strategy and growth strategy to advance the new Workforce Solutions platform;" "Developing customer outreach, engagement, and sales strategy for all Workforce Solutions offerings;" "Leading insights and discovery for product solution fit and product development;" "Developing strategic partnerships and agreements to quickly advance Workforce Solutions offerings;" and "Driving continuous improvement and customer insights within the Workforce Solutions platform." (Doc. No. 1-1, Job Description). The above are competitive services – thus, if Cunningham performs these services (or one similar), he could violate paragraph 7(b)(i) of the Agreement.

But GXO fails to clearly show how Cunningham has performed competitive services at Prologis. To be sure, Cunningham has accepted a role at Prologis,[5] but GXO brings no clear evidence to show when Cunningham will start performing – or that he has already performed – any competitive services there. GXO alleges that "Cunningham has been elusive about his start date at Prologis … In response to an inquiry to confirm Cunningham's starting date in a meet-and-confer prior to filing this motion, his counsel would confirm only that Cunningham intended to work at Prologis and would do so as soon as he and Prologis had agreed on a start date." (Doc. No. 24). Without any further evidence, GXO fails to demonstrate that Cunningham has performed any

---

[4] *See* Prologis, Inc., *Annual report pursuant to Section 13 and 15(d)* 4 (Feb. 14, 2023); *supra* footnote 1.

[5] (Doc. No. 23-1) (Cunningham notes he has "accepted a position with Prologis"); (*Id.*) (Cunningham references "my role at Prologis" in his affidavit while explaining Prologis' business"); (*Id.*) (Cunningham claims that "[i]n my new role, Prologis and GXO would not compete …").

14

competitive services. Thus, in light of North Carolina's distaste for restrictive covenants and the extraordinary nature of the relief GXO seeks, GXO fails to clearly show a likelihood of success on the merits, and this failure dooms its motion.

> ii. *Whether Cunningham has Misused Confidential Information*

Though Cunningham agrees GXO can protect its confidential information, he denies using any confidential information in his employment with Prologis. (Doc. No. 23, at 16). GXO appears to argue that Cunningham's use of confidential information is inevitable in his new position. (Doc. No. 19, at 15, 19). North Carolina law does not presume that an employee will inevitably disclose confidential information by working a managerial capacity for a new employer, even if that new employer is a competitor. *Travenol Lab'ys, Inc. v. Turner*, 30 N.C. App. 686, 694, 228 S.E.2d 478, 484 (1976) (upholding trial court decision not to enjoin employee from working for a competitor to prevent disclosure of confidential information because "there was no showing of an intent to disclose, nor could inevitability of disclosure be presumed from employment in a managerial capacity").[6]

Thus, GXO also fails to demonstrate a likelihood of success on the merits on this point because it fails to show that Cunningham has disclosed any confidential information or intends do so, and the Court will not presume that Cunningham inevitably will disclose confidential information simply by working for Prologis.

---

[6] *See also FMC Corp. v. Cyprus Foote Min. Co.*, 899 F. Supp. 1477, 1482 (W.D.N.C. 1995) (citing *Travenol Laboratories* for this proposition); *Union Carbide Corp. v. Sunox, Inc.*, 590 F. Supp. 224, 228 (W.D.N.C. 1984) (same); *see also Software Pricing Partners, LLC v. Geisman*, No. 319CV00195RJCDCK, 2022 WL 3971292, at *7 (W.D.N.C. Aug. 31, 2022) (citing *Travenol Laboratories* to note than an injunction cannot be "so broad that the defendant [former employee] may be deprived of the right to use his own skills and talents in this work for [the new employer].").

Therefore, because GXO failed to show that Cunningham breached the Agreement either by performing competitive services or by disclosing confidential information, GXO failed to carry its burden of demonstrating a likelihood of success on the merits of its breach of contract claim, the Court cannot grant the extraordinary relief GXO seeks.

## V. CONCLUSION

**IT IS, THEREFORE, ORDERED** that Plaintiff's Motion for a Temporary Restraining Order and Preliminary Injunction (Doc. No. 18) is **DENIED**.

**SO ORDERED.**

Signed: May 15, 2023

Robert J. Conrad, Jr.
United States District Judge